UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID FUHRMANN,<br><br>Defendant. | Criminal No. 25cr10066<br><br>Violation:<br><br>Count One: Conspiracy to Violate the Anti-Kickback Statute<br>(18 U.S.C. § 371)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 982(a)(7)) |

INFORMATION

At all times relevant to this Information:

GENERAL ALLEGATIONS

1. Defendant DAVID FUHRMANN was a 59-year-old resident of Suffolk County, New York. FUHRMANN was the National Sales Director for a collection of entities that performed mobile diagnostic services (collectively, "TCD Company"). FUHRMANN paid bribes on behalf of the TCD Company to induce doctors to order transcranial Doppler ("TCD") ultrasounds. TCD Company submitted claims to Medicare and other insurance companies for reimbursement for those TCD ultrasounds based on fraudulent diagnoses.

2. Timothy Doyle was the TCD Company's Chief Operations Officer.

3. Coconspirator Company Representative ("CC-1") was a Director of Operations and Sales Director-Northeast for TCD Company. CC-1 paid and facilitated bribes on behalf of the TCD Company to induce doctors to order TCD ultrasounds for which TCD Company submitted claims to Medicare and other insurance companies for payment based on fraudulent diagnoses.

4.  Coconspirator Company Manager ("CC-2") was TCD Company's Chief Financial Officer. CC-2 provided and/or arranged for cash to be provided on behalf of the TCD Company to induce those doctors to order TCD ultrasounds, for which TCD Company submitted claims to Medicare and other insurance companies for payment based on fraudulent diagnoses.

5.  Medicare was a federally funded health care program providing benefits to persons who are 65 years of age or older or disabled. The United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"), administered Medicare. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

6.  Medicare was a "health care benefit program" as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

7.  Medicare Part B paid for medically necessary outpatient medical services. Medicare authorized payment for outpatient services if the care was actually provided and was medically necessary; that is, the services were required because of disease, disability, infirmity, or impairment. Medicare would not pay for services and treatment that were not actually provided or for which that patient did not meet the criteria necessary to justify the claimed service or treatment.

8.  By becoming a participating provider in Medicare, enrolled providers agreed to abide by the policies, procedures, rules, and regulations governing reimbursement, and furthermore, certified that they would not knowingly present, or cause to be presented, false and fraudulent claims. To participate as a Medicare provider and receive Medicare funds, enrolled

providers, together with their authorized agents, employees, and contractors, were required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors.

9. Upon certification, the medical provider, whether a clinic or an individual, was assigned a provider identification number for Medicare billing purposes (referred to as an "NPI"). When the medical provider rendered a service, the provider submitted or caused the submission of a claim for reimbursement to the Medicare contractor or carrier that included the NPI assigned to that medical provider.

10. To receive reimbursement for a covered service from Medicare, a provider was required to submit a claim, either electronically or using a form (*e.g.*, a CMS-1500 form or UB-92) containing the required information appropriately identifying the provider, patient, and services rendered.

11. Health care providers were given, and provided with online access to, Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations. Providers could only submit claims to Medicare for services they rendered, and providers were required to maintain patient records to verify that the services were provided as described on the claim form. These records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the health care provider. Among other things, the requirements included providing an accurate diagnosis and the nature of illness that was being treated.

12.     Under the Social Security Act, for any item or service to be covered by Medicare, it must have (1) been eligible for a defined Medicare benefit category, (2) been reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and (3) met all other applicable Medicare statutory and regulatory requirements. *See* 42 U.S.C. § 1395.

13.     Medicare regulations required health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted or whose submission was caused by the physician. Medicare required complete and accurate patient medical records so that Medicare could verify that the services described on the claim form were provided. These records were required to permit Medicare to review the appropriateness of Medicare payments made to the health care provider.

The Federal Anti-Kickback Statute

14.     To enroll as a Medicare provider, Medicare required providers to abide by Medicare laws, regulations, and program instructions. Medicare further required providers to certify that they understood that a payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with these laws, regulations, and program instructions, including the Federal Anti-Kickback Statute. Accordingly, Medicare would not pay claims procured through kickbacks and bribes.

Transcranial Doppler Ultrasounds

15. A TCD ultrasound was a noninvasive diagnostic test that could be used to estimate the blood flow through certain blood vessels in the brain by bouncing high-frequency sound waves off blood vessels.

16. Medicare contractors issued Local Coverage Determinations ("LCDs") that set forth when certain items or services are considered medically necessary (and thus covered) or medically unnecessary (and thus not covered). During the relevant period, Medicare contractors issued LCDs for non-invasive vascular studies, which included TCD ultrasounds. For example, LCD 27355 was applicable in New York, among other states (including, as of October 18, 2013, Massachusetts), to services performed between in or about June 2013 through in or about September 2015, as was LCD 33627, which replaced LCD 27355 to reflect an updated version of the national reference for diagnostic codes and which was applicable to services performed from in or about October 2015 through the present.

17. The LCDs generally set forth that non-invasive vascular studies were medically unnecessary unless (1) significant signs/symptoms of arterial or venous disease were present; (2) the information was necessary for appropriate medical and/or surgical management; and/or (3) the test was not redundant of other diagnostic procedures that must have been performed.

18. For instance, LCD 27355 set forth only eight medical reasons for which Medicare would pay for TCD ultrasounds, which could include Healthcare Common Procedure Coding System ("HCPCS") procedure codes 93886 (Transcranial Doppler study of the intracranial arteries; complete), 93890 (vasoreactivity study), and 93892 (emboli detection without intravenous microbubble injection). These medical reasons were generally limited to suspected

5

or actual significant blockages of the blood vessels in the brain, blood flow for patients with suspected brain death or undergoing certain operations, and conditions relating to aneurysms in the brain. These diagnoses generally included neurovascular conditions such as cerebral infarctions due to embolisms, brain death, vertebro-basilar artery syndrome (or vertebro-basilar artery insufficiency) ("VBI"), or occlusion or stenosis of cerebral arteries, as well as conditions relating to sickle-cell disease.

19. Federal regulations required that diagnostic tests could only be ordered by the physician who was treating a beneficiary for a specific medical problem and who used the results in the management of the beneficiary's specific medical problem. 42 C.F.R. § 410.32(a). Tests ordered by the physician who was not treating the beneficiary were not reasonable and necessary.

20. Medicare only covered a limited set of preventative services, which, in the context of diagnostic tests, were commonly referred to as screening tests. The screening tests permitted under Medicare's rules, regulations, policies, and procedures did not include TCD ultrasounds.

Overview of the Conspiracy to Pay and Receive Kickbacks

21. From in or about June 2013 until in or about September 2020, FUHRMANN, Doyle, CC-1, CC-2, and other coconspirators known and unknown conspired to offer, pay, solicit, and receive, and did offer, pay, solicit, and receive kickbacks for ordering medically unnecessary diagnostic tests in different states, including New York, Connecticut, Massachusetts (from approximately March 2015 through February 2018), Florida, Texas, California, New Jersey, and Pennsylvania.

22.     Beginning in or about June 2013, FUHRMANN, Doyle, CC-1, and CC-2 entered into agreements with various doctors in which they agreed to offer and pay doctors, and sometimes staff members, based on the number of TCD ultrasounds the doctors ordered.

23.     For many doctors, FUHRMANN, Doyle, CC-1, and CC-2 created purported rental and administrative service agreements, which on paper made it appear as if doctors were compensated for TCD Company's use of space and administrative resources of the ordering doctor's practice based on fair market value and not based on the volume or value of referrals. These agreements were shams that hid the true nature of the arrangement—that doctors were paid based on the number of TCD ultrasounds ordered.

24.     From approximately June 2013 until approximately September 2020, in exchange for those kickbacks, doctors signed tens of thousands of orders for medically unnecessary TCD ultrasounds using false diagnoses to cause Medicare and private insurance companies to pay for the testing, some of which was not performed.

### Object and Purpose of the Conspiracy to Pay and Receive Kickbacks

25.     The object and purpose of the conspiracy was for FUHRMANN, Doyle, CC-1, and CC-2 to offer, pay, solicit, and receive kickbacks in connection with the referral of patients for TCD testing reimbursed in whole or in part by Medicare. The principal purpose of the conspiracy was to offer, pay, solicit, and receive kickbacks to generate referrals of medically unnecessary tests to enrich themselves and others, known and unknown.

Manner and Means of the Conspiracy to Pay and Receive Kickbacks

26. The manner and means by which FUHRMANN, Doyle, CC-1, and CC-2, and coconspirators known and unknown, carried out the conspiracy to pay and receive kickbacks were the following:

   a. Offering and paying cash and check kickback payments to doctors in exchange for doctors ordering the TCD ultrasounds;

   b. Soliciting and receiving cash and check kickback payments in exchange for ordering the TCD ultrasounds;

   c. Communicating via text messaging concerning the payment and delivery of kickback payments;

   d. Creating sham agreements to disguise the per patient kickback arrangement;

   e. Including false diagnoses on the orders for the TCD testing so that Medicare was misled into believing that the patients fit the coverage criteria for TCD testing;

   f. Billing Medicare for approximately $70.6 million in fraudulent and kickback-tainted claims; and

   g. Receiving approximately $27.2 million from Medicare in fraudulent and kickback-tainted claims.

Overt Acts in Furtherance of the Kickback Conspiracy

27. FUHRMANN and others known and unknown carried out the following acts in furtherance of the kickback conspiracy:

8

a.  On or about December 12, 2014, FUHRMANN arranged for Doyle to deliver cash kickbacks to an employee at Dr. Kenneth Fishberger's office.

b.  On or about October 18, 2016, FUHRMANN delivered a cash kickback to Dr. Fishberger.

c.  On or about September 6, 2017, in response to a question from CC-2 asking "How much cash did u give yesterday[?]," FUHRMANN informed CC-2 that FUHRMANN paid Dr. Donald Salzberg cash kickbacks of $8,625 for 85 tests.

d.  On or about August 8, 2019, FUHRMANN delivered cash kickbacks to Dr. Salzberg; and

e.  On or about July 20, 2020, FUHRMANN arranged for CC-1 to assist a doctor in creating false and misleading medical records to respond to a request for records from a private health insurer relating to TCD ultrasounds performed by TCD Company.

9

<u>COUNT ONE</u>
Conspiracy to Pay and Receive Kickbacks
(18 U.S.C. § 371)

The United States Attorney charges that:

28. The United States re-alleges and incorporates by reference paragraphs 1-28.

29. From in or about at least June 2013 to at least in or about September 2020, in the District of Massachusetts and elsewhere, the defendant,

DAVID FUHRMANN,

conspired with others known and unknown to the United States to commit an offense against the United States, that is, to knowingly and willfully offer and pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks, to induce the referral of patients for items and services, for which payment may be made in whole and in part by a federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b).

All in violation of Title 18, United States Code, Section 371.

10

## FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(7))

The United States Attorney further alleges:

30. Upon conviction of the offense in violation of Title 18, United States Code, Sections 371, set forth in Count One, the defendant,

### DAVID FUHRMANN,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense. The property to be forfeited includes, but is not limited to, the following:

    a. $1,242,000 in United States currency, to be entered in the form of an Order of Forfeiture (Money Judgment).

31. If any of the property described in Paragraph 31, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(7), as a result of any act or omission of the defendant—

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 31 above.

All pursuant to Title 18, United States Code, Section 982(a)(7).

LEAH B. FOLEY
United States Attorney

By:    */s/ Howard Locker*
       HOWARD LOCKER
       MACKENZIE A. QUEENIN
       Assistant U.S. Attorneys

Date: February 20, 2025